IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

TERRY JUNIOR PETERSON,              §
     TDCJ-CID #894321,              §
v.                                                    §              CASE NO. 2:11-cv-176
                                   §
ROBERT A. MORIN, ET AL.              §

## MEMORANDUM AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

In this civil rights action, Texas state prisoner Terry Junior Peterson ("plaintiff") complains that he was exposed to unsanitary and unsafe conditions of confinement while housed at the Garza West Transfer Facility, in violation of his Eighth Amendment right to be free from cruel and unusual punishment.  Plaintiff has filed a motion for summary judgment arguing that there is no genuine issue of a material fact that defendants knew of the unconstitutional conditions of confinement, yet failed to remedy the problems.  (D.E. 43). Defendants have filed a response in opposition (D.E. 46), and in turn, have filed a cross-motion for summary judgment (D.E. 48), moving to dismiss plaintiff's claims for failure to exhaust administrative remedies and/or on the basis of qualified immunity.  (D.E. 48). Plaintiff has filed a response opposing defendants' summary judgment motion.  (D.E. 59).

For the reasons stated herein, except for official capacity claims, it is respectfully recommended that the Court deny the parties' motions for summary judgment, and that this case proceed to trial against all defendants.

## I.      Jurisdiction.

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.

## II.     Procedural background.

Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division ("TDCJ-CID"), and is currently incarcerated at the Stringfellow Unit in Rosharon, Texas, although his complaint concerns events that occurred while he was confined at the Garza West Unit in Beeville, Texas.  He filed his original complaint on May 27, 2011, complaining that he had contracted a severe and persistent ringworm infection due to the unsanitary conditions of the Delta Dorm at the Garza West Unit.  (D.E. 1).

A Spears[1] hearing was conducted on July 7, 2011, following which it was recommended that plaintiff's unconstitutional conditions of confinement claims be retained and that service be ordered on the following five (5) defendants:[2] (1) Lieutenant Robert A. Morin; (2) Officer Cristina E. Cano; (3) Lieutenant Eismael Ruiz, Jr.; (4)  Warden Lorie L. Davis; and (5) Safety Officer Robyn Delgado.  (D.E. 17, 18).

On October 25, 2011, defendants filed their answer to plaintiff's complaint and raised the defense of qualified immunity.  (D.E. 26).

---

[1]Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).

[2] Plaintiff moved to certify this proceeding as a class action (D.E. 21), but his request was denied.  (D.E. 25, 29).

2

On January 3, 2012, plaintiff filed a motion for summary judgment.  (D.E.43).  On January 5, 2012, defendants filed a response opposing plaintiff's summary judgment motion. (D.E. 46).

On February 3, 2012, defendants filed the instant motion for summary judgment. (D.E. 48).  Plaintiff was granted an extension of time to file a summary judgment response (D.E. 56), and on March 19, 2012, he filed his response in opposition to defendants' summary judgment motion.  (D.E. 59).

**III.    Summary judgment evidence.**

In support of his motion for summary judgment (D.E. 43), plaintiff offers his declaration made under penalty of perjury.  (PSJ, Peterson Dec. at 1).[3]

Defendants offer the following exhibits in support of their motion:

Ex. A:      Relevant portions of plaintiff's TDCJ-CID grievance records, with business records affidavit;

Ex. B:      Relevant portions of plaintiff's medical records, with business records affidavit; and

Ex. C:      Affidavit of Dr. Steven Bowers.

The summary judgment evidence establishes the following:

---

[3] "PSJ" refers to plaintiff's summary judgment motion ( D.E. 43), followed by a page or paragraph number, as appropriate).  "DSJ" refers to defendants' summary judgment motion (D.E. 48), followed by an exhibit letter.

Plaintiff has diabetes mellitus and is insulin-dependent.  (DSJ Ex. B at 2).  He also suffers from Hepatitis C.  Id. at 12.

Beginning in October 2010, plaintiff and other offenders began complaining to defendants about the unsanitary conditions in the Delta Dorm bathroom, including broken pipes, standing water, and clogged toilets and sinks.  (PSJ, Peterson Dec. at ¶ 3).

On September 6, 2010, plaintiff filed a sick call request ("SCR") complaining of difficulty hearing in both ears due to an infection, and of swollen and painful legs making it difficult for him to walk.  (DSJ Ex. B at 1).  On September 7, 2010, plaintiff reported to the infirmary where he was seen by Dr. Larry Bininger.  Id. at 2.  Upon examination, Dr. Bininger noted that plaintiff's feet were swollen, but he did not observe a rash.  Id.  Dr. Bininger's assessment was that plaintiff's work boots,[4] a size 10-regular, were too small, and he ordered him a size 11-EEE.  Id.

On December 1, 2010, plaintiff again complained to prison officials about clogged urinals and sinks, and he claimed that sewer water containing feces was on the bathroom floor and under the bunks in Delta Dorm.  (PSJ, Peterson Dec. at ¶ 4).  The next day, Lieutenant Morin came to inspect the bathroom area, and plaintiff asked him for cleaning supplies.  Id. at ¶ 5.  Lieutenant Morin did not answer plaintiff and walked out.  Id.  Plaintiff did not receive cleaning supplies and the sewer water remained on the floor through the weekend.  Id.  The odor from the bathroom permeated the entire living area.  Id.

---

[4] Plaintiff was assigned to the hoe squad.

On December 2, 2010, plaintiff filed a SCR complaining of a "bad infection" in his leg and severely dry skin. (DSJ Ex. B at 3). On December 8, 2010, plaintiff was seen in the infirmary by physician's assistant ("PA") Avrian Mendez. Id. at 4-8. PA Mendez noted that plaintiff had an area of swelling and discoloration, approximately 15.5 cm by 7 cm, on his left lower extremity, and it was warm to the touch with increased pain and tenderness. Id. at 4. PA Mendez's impression was boil or abscess, and he prescribed an antibiotic, Bactrim, to be taken orally for 14 days, as well as Ibuprofen for pain. Id. at 5. PA Mendez advised plaintiff to keep his leg elevated as much as possible, to finish completely the antibiotic, and to return to the clinic on December 10, 2010 for a follow-up appointment. Id.

On December 10, 2010, plaintiff returned to the infirmary where he was seen by PA Jose Declet. (DSJ Ex. B at 9-11). Plaintiff's vital signs were stable, but his left leg remained swollen, and PA Declet noted a minor, superficial rash as well. Id. at 9. PA Declet prescribed Hydrocortisone cream to be applied to the rash-like area, and also ordered TED Hose compression stockings to aid in circulation. Id. at 10.

On December 24, 2010, plaintiff filed a SCR complaining that he had finished his oral antibiotic, but he continued to have "some kind of fungus" on his leg, which he believed he contracted "from the shower." (DSJ Ex. B at 16). Plaintiff was seen in the infirmary that same day, and he complained to Nurse Cynthia Lewis that the antifungal cream he had been given was not working. (DSJ Ex. B at 14-15). Nurse Lewis noted that plaintiff had failed to pick up the Hydrocortisone cream prescribed by PA Declet, but instead, he had been using

Tolnaftate, an antifungal medication. Id. at 14.  Nurse Lewis re-ordered the Hydrocortisone cream and instructed plaintiff to check with the pill window next week.  Id.

On December 25, 2010, plaintiff and other inmates informed Lieutenant Ruiz that the Delta Dorm bathroom showers, urinals, and sinks were clogged again, and that the conditions were unsanitary.  (PSJ, Peterson Dec. at ¶ 6).  Lieutenant Ruiz stated that he would contact maintenance, but no maintenance personnel arrived on that day.  Id.

On January 3, 2011, plaintiff filed a SCR complaining that the fungus on his left leg had gotten much worse, and that he had been suffering for a month.  (DSJ Ex. B at 17).  Plaintiff was scheduled to be seen in the clinic on January 6, 2010, however, he failed to attend that appointment.  Id. at 18.

On January 10, 2011, inmates complained to Safety Officer Delgado about the mold and mildew in the bathroom and showers.  (PSJ, Peterson Dec. at ¶ 8).  No action was taken, nor did the inmates receive cleaning supplies that they requested. Id.

On January 21, 2011, plaintiff filed a SCR complaining that he still had the fungus on his leg and that the medications had not helped.  (DSJ Ex. B at 19).  Nurse Jessica Bernal ordered plaintiff Lotrimin 1% cream to be applied twice daily.  Id. at 20.

On January 19, 2011, Captain Hales and Officer Cano inspected the Delta Dorm bathroom and made a list of all the repairs that needed to be made; however, the repairs were not made for another 2 to 4 weeks.[5]  (PSJ, Peterson Dec. at ¶ 7).

---

[5]Plaintiff originally named Captain Hales as a defendant also, but his claims against him were dismissed.  (See D.E. 17, 27).

On January 25, 2011, plaintiff reported to the infirmary complaining of an "itchy rash" on his left leg, that had improved slightly, but then returned. (DSJ Ex. B at 21). The provider's assessment was "tinea corporis," also known as ringworm, and plaintiff was prescribed another 14-day treatment of Lotrimin. Id.

On February 22, 2011, Officer Cano came to Delta Dorm to unclog a urinal. (PSJ, Peterson Dec. at ¶ 9). Several inmates asked if she could adjust the temperature in the showers because the water, which was previously cold, was now so hot it was causing burns. Id. Officer Cano refused stating that the water is "either hot or cold" and left. Id.

### Plaintiff's grievance concerning the Delta Dorm bathroom.

On December 27, 2010, plaintiff filed a Step 1 grievance, Grievance No. 2011071534, detailing his problems with the infection on his leg, and alleging that "Delta Dorm is a health hazard." (DSJ Ex. A at 1-2). Plaintiff complained:

> ... there is mold and mildew all over the walls and shower[,] different kinds of fungus all over the showers, there [is] stagnant water in both #1 shower and sink. The toilets have been backed up with urine in [them] and put off a really bad odor. Gnats coming out of the drains, these kind of conditions can cause sickness, and other kinds of illness, like fungus, Hepatitis B, Scabies, foot fungus, E-coli, Staph infection. We have to talk to 3 to 4 different officials about the poor conditions on our dorm. The maintenance officials, T.D.C. ID staff repeatedly ignored the conditions.

(DSJ Ex. B at 2).

On December 28, 2010, an investigation was initiated on plaintiff's claims of unsanitary conditions and unclean showers in Delta Dorm. (DSJ Ex. A at 7-15).

By memorandum dated January 18, 2010, defendant Safety Officer Robyn Delgado responded:

> This office inspected D Building I dorm and did not notice any fungus but did see soap scum. Work orders are for the following:
>
> WO# 409511003263        Urinal 2 clogged
> WO# 409511003264        Urinal 3 clogged
> WO# 409511002923        Shower 1 water runs constantly
> WO# 409511002256        Urinal 1 clogged
> WO# 409511003300        Sink 8 clogged-closed 12-29-10
> WO# 409511003815        Shower 1 water runs
> WO# 409511001653        Sink 1
>
> D Building 1 dorm did have an offender janitor assigned to the dorm.
>
> This office checked with Supply Department and chemicals were signed out for the shifts.
>
>                 .  .  .  .  .
>
> Pest Control sprayed and was escorted by R. Delgado URM and completed all housing on January 6, 2011.

(DSJ Ex. A at 11).

On February 3, 2011, Warden Pawelek denied plaintiff's Step 1 grievance stating:

> Investigation reveals cleaning chemicals and pest control have been utilized.  Work orders were issued for urinals 1, 2, and 3, sinks 1 and 8, and shower 1.  No further action warranted.

(DSJ Ex. A at 2).

On February 10, 2011, plaintiff filed a Step 2 appeal of Grievance No. 2011071534.

8

(DSJ Ex. A. at 3-4).  Plaintiff argued that, although certain chemicals were provided for cleaning, neither bleach nor "Double D" were provided, and Captain Hailes told plaintiff that those were the chemicals needed.  Id. at 3.  Plaintiff stated that urinals 1 and 2 were still not working properly; sinks 1, 5, and 7 did not have hot water; sink 8 had no water; shower 1 was broken; and showers 1, 2, 3, and 4 were still covered with a fungus, and that gnats came out of the drains.  Id.

On March 4, 2011, a investigation was opened on plaintiff's Step 2 grievance.  (DSJ Ex. A at 6).  Regional Grievance Investigator A. Robinson reported:

> Two of the mentioned urinals were checked by a maintenance technician, and no problems were located.
> 1/18/11, Unit has work orders for the deficiencies attached.  All capital spending has been terminated by agency leadership due to the current state budget crisis.  Repair for emergency items only.

(DSJ Ex. A at 6).

On March 8, 2011, Assistant Regional Director Juan Garcia denied plaintiff's Step 2 appeal, noting that:

> Every effort is being made to correct all deficiencies on the unit in a timely manner.  Unit maintenance technicians are aware of the problems and will make repairs as time and materials permit.

(DSJ Ex. A at 4).

## IV.   Summary judgment standard.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue

is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motions.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence or evaluate the credibility of witnesses.  See id.  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein."  Fed. R. Civ. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559 (5th Cir. 1992).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  Fed. R. Civ. P. 56(c);  Anderson, 477 U.S. at 248-49.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  Caboni, 278 F.3d

10

at 451.  "If reasonable minds could differ as to the import of the evidence . . . a verdict should

not be directed."  Anderson, 477 U.S. at 250-51.

## V.    Discussion.

### A.    Exhaustion.

Defendants move for summary judgment to dismiss plaintiff's claims for failure to

exhaust administrative remedies.

The Prison Litigation Reform Act provides:

> No action shall be brought with respect to prison conditions
> under section 1983 of this title, or any other Federal law, by a
> prisoner confined in any jail, prison, or other correctional
> facility until such administrative remedies as are available are
> exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement applies to all inmate suits about prison life, whether

involving general circumstances or specific incidents.  Porter v. Nussle, 534 U.S. 516, 532

(2002); Clifford v. Gibbs, 298 F.3d 328, 330 (5th Cir. 2002).  Moreover, a prisoner is

required to exhaust his administrative remedies even if damages are unavailable through the

grievance process.  Booth v. Churner, 532 U.S. 731, 734 (2001); Wright v. Hollingsworth,

260 F.3d 357, 358 (5th Cir. 2001).  A prisoner must complete the administrative review

process in accordance with all procedural rules, including deadlines, as a precondition to

bringing suit in federal court.  Woodford v. Ngo, 548 U.S. 81, 83 (2006).  Because

exhaustion is an affirmative defense, inmates are not required to plead or demonstrate

exhaustion in their complaints.  Jones v. Bock, 549 U.S. 199, 215 (2006).

The TDCJ provides a two-step procedure for presenting administrative grievances. See Powe v. Ennis, 177 F.3d 393, 394 (5th Cir. 1999) (per curiam).[6]   The Fifth Circuit requires that both steps be completed in order to file suit in federal court.  Johnson v. Johnson, 385 F.3d 503, 515-16 (5th Cir. 2004).

The purpose of the exhaustion requirement is to alert prison officials of problems so that the prison has a chance to address the claims before they reach federal court.  Woodford, 126 S. Ct. at 2388.  See also Johnson, 385 F.3d at 517 (the exhaustion requirement provides prison officials with "time and opportunity to address complaints internally").   As acknowledged by the Supreme Court, Congress intended the administrative process to "filter out some frivolous claims and foster better-prepared litigation once a dispute did move to the courtroom, even absent formal factfinding."  Booth, 532 U.S. at 737.

Plaintiff filed a Step 1 grievance complaining about the Delta Dorm bathroom conditions on December 27, 2010.  (DSJ Ex. A at 1-2).  Defendants contend that this grievance does not satisfy § 1997e(a)'s exhaustion requirement because it "... does not name, allude to or describe any active [sic] Defendant or the unconstitutional acts forming the basis

---

[6] Step 1 requires the inmate to present an administrative grievance at his unit within fifteen days from the date of the issue he is complaining about.  Wendell v. Asher, 162 F.3d 887, 891 (5th Cir. 1998).  The inmate should then receive a response from the unit official, and if unsatisfied with the response, the inmate has ten days to appeal by filing a Step 2 grievance. Wendell, 162 F.3d at 891.  Once the two-step process has been completed, the offender's administrative remedies within the TDCJ have been exhausted. See http://www.tdcj.us/ publications/admin-rvw/Offender%20Grievance%20pamphlet%202007.pdf.  An inmate dissatisfied with the Step 2 response may file suit in district court.  See 42 U.S.C. § 1997e(a).

of Plaintiff's claims.  He only complains about sanitary conditions and his health in a general

sense."  (DSJ at 5).

In Johnson, the Fifth Circuit discussed how much detail is required in a grievance to

exhaust administrative remedies, and noted:

> In deciding how much detail is required in a given case, we
> believe that a court must interpret the exhaustion requirement in
> light of its purposes, which include the goal of giving officials
> "time and opportunity to address complaints internally."  Thus,
> a grievance should be considered sufficient to the extent that the
> grievance gives officials a fair opportunity to address the
> problem that will later form the basis of the lawsuit.  Further, as
> a practical matter, the amount of information necessary will
> likely depend to some degree on the type of problem about
> which the inmate is complaining.  If an inmate claims that a
> guard acted improperly, we can assume that the administrators
> responding to the grievance would want to know – and a
> prisoner could ordinarily be expected to provide – details
> regarding who was involved and when the incident occurred, or
> at least other available information about the incident that would
> permit an investigation of the matter.  In contrast, a grievance in
> which an inmate says that his cell is habitually infested with
> vermin, or that prices in the commissary are too high, could
> adequately alert administrators to the problem whether the
> grievance names anyone.

Johnson. 385 F.3d at 517 (citations omitted).

Plaintiff's complaints about the Delta Dorm bathroom facilities are comparable to the

Fifth Circuit's example in Johnson, noted above, of an inmate complaining about a rodent-

infested cell.  The Fifth Circuit found that grievances about a condition or practice in general

would not necessarily need to identify or name a particular defendant to alert prison

administrators of the issue.  Johnson, 385 F.3d at 517.  Similarly, in this case, plaintiff was

not required to discover what department or individual was in charge of bathroom maintenance nor complain about those persons in raising the problem in a grievance. Indeed, his Step 1 grievance did serve to advise prison administrators of the problems, and an investigation was initiated as a result of plaintiff filing his grievance. (DSJ Ex. A at 11). Plaintiff adequately exhausted his complaints as required by § 1997e(a), and it is therefore respectfully recommended that defendants' motion for summary judgment to dismiss plaintiff's claims for failure to exhaust be denied.

### B.    Eleventh amendment.

Plaintiff has sued defendants for compensatory and punitive damages. (See D.E. 1 at 5). Plaintiff did not specify in what capacity he was suing defendants, and therefore, it is assumed that he is suing them in both their individual and official capacities.

A suit for damages against an official in his official capacity is not a suit against that official but a suit against the state itself. Howlett v. Rose, 496 U.S. 356, 365-66 (1990). However, the Eleventh Amendment acts as a jurisdictional bar to a suit against the state for money damages. Pennhurst State Hosp. v. Halderman, 465 U.S. 89, 100 (1984); Oliver v. Scott, 276 F.3d 736, 742 (5th Cir. 2002) (noting that the Eleventh Amendment bars money damages against TDCJ officers in their official capacities). Accordingly, to the extent plaintiff has sued defendants in their official capacities for money damages, it is respectfully recommended that those claims be dismissed with prejudice as barred.

C.     **Qualified immunity and plaintiff's claims of unconstitutional conditions of confinement.**

Plaintiff contends that he was subjected to unconstitutional conditions of confinement while housed at the Delta Dorm in the Garza West Unit and, as a consequence of the unsanitary conditions, he contracted ringworm. He claims that the ringworm persisted and required additional treatment to cure because the restrooms did not work properly, were not cleaned properly, and a fungus continued to grow in the showers. Defendants maintain that they are not liable for damages because the complained of conditions did not rise to the level of a constitutional violation, and even if the conditions were unconstitutional, defendants acted objectively reasonably in attempting to remedy the complained of conditions.

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 230 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). To discharge this burden, the plaintiff must satisfy a two-prong test." Atteberry v .Nocana Gen. Hosp., 430 F.3d 245, 251-52 (5th Cir. 2005). First he must claim that the defendants committed a constitutional violation under current law. Id. (citation omitted). Second, he must claim that defendants'

15

actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of.  Id.

While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  Pearson, 555 U.S. at 236 (receding from Saucier v. Katz, 533 U.S. 194 (2001)).

**Step 1 – Constitutional violation.**

The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII.  Prison officials must provide humane conditions of confinement; ensure that inmates receive adequate food, clothing, shelter, and medical care; and take reasonable measures to guarantee the safety of the inmates.  Farmer v. Brennan, 511 U.S. 825, 832 (1994). Conditions that result in "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities" violate the Eighth Amendment.  Hudson v. McMillian, 503 U.S. 1, 8-10 (1992); Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

The Supreme Court has developed a two-part analysis to govern Eighth Amendment challenges to conditions of confinement.  First, under the "objective component," a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment.  Hudson, 503 U.S. at 8.  The challenged condition must be "extreme."  Id. at 9.  While an inmate "need not await a tragic event" before seeking relief," Helling v. McKinney, 509 U.S. 25, 33 (1993), he must at the very least show that a condition of his

16

confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety. Id. at 35.  Moreover, the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury will actually be caused by exposure to [the challenged condition of confinement].  Id.  It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwilling to such a risk.  Id.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.  Id. at 36.  The Eighth Amendment thus guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities."  Rhodes, 452U.S. at 347.

Second, the prisoner must show that the defendant prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue.  Hudson, 503 U.S. at 8.  The proper standard is that of deliberate indifference.  Wilson v. Seiter, 501 U.S. 294, 303 (1991).  Negligence does not suffice to satisfy this standard, id. at 305, but a prisoner need not show that the prison official acted  with "the very purpose of causing harm or with knowledge that harm would result."  Farmer, 511 U.S. at 835.  In defining the deliberate indifference standard, the Farmer Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837.  Furthermore, the official may escape liability for known risks "if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

The summary judgment evidence establishes that, beginning in September 2010, plaintiff was seen in the Garza Unit infirmary for a persistent infection on his lower left leg. (DSJ Ex. B).  The infection was diagnosed initially as a boil or abscess, then a rash, and then as ringworm.  Id. at 4-8, 9-10, 21.   Plaintiff's medical records indicate that his SCRs were timely answered and that he was seen by medical personnel and treatment was provided on a timely and repeated basis.  Indeed, plaintiff does not complain about his medical care, but instead maintains that defendants knew of the unsanitary conditions in the Delta Dorm bathroom and that these conditions posed a risk to his health, ignored the risk, causing plaintiff to suffer damages.

Defendants argue that plaintiff fails to state a constitutional violation because, even if the bathrooms were unsanitary, he cannot establish that he contracted ringworm from the showers nor that he suffered an injury for purposes of invoking the Eighth Amendment's prohibition against cruel and unusual treatment.  In support of their contention that plaintiff cannot establish harm from the complained of conditions, defendants offer the affidavit of Dr. Steven Bowers, a licensed physician employed as the director of continuing education for the University of Texas Medical Branch, Correctional Managed Care.  (DSJ Ex. C, Bowers Aff't at ¶ 2).  Dr. Bowers testifies that he has reviewed plaintiff's TDCJ medical records and that, as early as 1999, plaintiff complained of a history of skin rashes.  (Id., Bowers Aff't at ¶ 5).  Dr. Bowers notes that plaintiff has Hepatitis C and Diabetes Mellitus,

and that both of these conditions "can affect the immune system," and that "diabetes is noted to make patients more susceptible to skin infections as well as general infections." (Id., Bowers Aff't at ¶ 6). Dr. Bowers also points out that plaintiff refused to take his insulin, which made his blood sugar more difficult to regulate, which in turn made him more susceptible to infection. Id. Also, plaintiff was obese, and this too, made him more susceptible to a fungal rashes, as did his job assignment to the hoe squad because ringworm thrives in moist and warm environments. Id.

Dr. Bowers testifies that plaintiff was not diagnosed definitely with ringworm until January 25, 2011. (DSJ, Ex. C, Bowers Aff't at ¶ 5). Plaintiff complained of athlete's foot on October 6, 2010, but upon examination Dr. Bininger failed to observe a rash, but believed plaintiff's work boots were too small, and prescribed a larger shoe size. (DSJ Ex. B at 2). On December 7, 2010, plaintiff complained of a painful infection on his leg. (DSJ Ex. B at 3). PA Mendez characterized the infection as a boil or abscess attributable to a Staph infection, and prescribed plaintiff oral antibiotics. (DSJ Ex. B at 5). Dr. Bowers notes that the use of broad spectrum antibiotics, such as the Bactrim prescribed to plaintiff for Staph, "can increase the overgrowth of fungal infections on and in the body." (DSJ Ex. C, Bowers Aff't at ¶ 6). In fact, plaintiff had just finished the Bactrim antibiotic on December 24, 2010, when he filed a SCR complaining that his rash had become worse. (DSJ Ex. B at 16). Plaintiff told PA Declet that the antifungal cream he had been using was not working, and

19

PA Declet prescribed Hydrocortisone cream.[7]  (DSJ Ex. B at 14).  The rash continued and

on January 25, 2011, a medical provider diagnosed plaintiff with ringworm and prescribed

Lotrimin.  (DSJ Ex. B at 20).  Dr. Bowers notes that there are oral antifungal medications that

can be used in severe cases, but most of those medications are toxic to the liver and would

have been contradicted for plaintiff due to his Hepatitis C.  (DSJ Ex. C, Bowers Aff't at ¶ 7).

    In his SCRs, plaintiff attributed his leg infection and rash to a fungus in the shower;

however, no medical provider suggested that the Delta Dorm bathroom conditions were the

cause of his infection or rash.  Dr. Bowers has explained that plaintiff is more susceptible to

skin infections and rashes by virtue of his diabetes and Hepatitis, his obesity, his assignment

to the hoe squad, and the oral antibiotics previously prescribed.  (DSJ Ex. C, Bowers Aff't

at ¶ 6).  Dr. Bowers concludes that:

> In summary, in Mr. Peterson's case, there were several
> possibilities as to how he contract a superficial fungal infection
> and with his attendant medical diagnoses, a dirty shower is way
> down the list of possible sources.

(DSJ Ex. C, Bowers Aff't at ¶ 8).

    In his summary judgment response, plaintiff fails to offer any evidence to contradict

or call into question Dr. Bowers' expert opinion that it is unlikely that plaintiff contracted

ringworm from a dirty shower or bathroom.  (See D.E. 59).  Thus, defendants have

---

[7] In fact. PA Declet had prescribed the Hydrocortisone cream on December 10, 2010, but
plaintiff did not obtain that prescription but instead, was applying an antifungal cream to the
infected area.  (DSJ Ex. B at 10, 14).

established that, even if the Delta Dorm was unsanitary, it is unlikely that the complained of conditions caused plaintiff to contract ringworm.

Defendants argue that summary judgment in their favor is appropriate because there is no evidence that the complained of conditions caused plaintiff to contract ringworm. However, defendants are incorrect in their assumption that plaintiff must have suffered an adverse medical reaction to support an Eight Amendment claim.  Indeed, the federal courts have long acknowledged that prolonged exposure to unsanitary conditions, including exposure to human waste, can pose a serious health hazzard.  See e.g. Gates v. Cook, 376 F.3d 323, 341 (5th Cir. 2004); DeSpain v. Uphoff, 264 F.3d 965, 974 (10th Cir. 2001) (exposure to human waste "evokes both the health concerns emphasized in Farmer and the more general standards of dignity embodied in the Eighth Amendment); Fruit v. Norris, 905 F.2d 1147, 1151 (8th Cir. 1990).  The plaintiff need not demonstrate that he suffered a serious injury, but rather that he was exposed to a serious risk of harm, and that defendants were aware of the risk, yet ignored it.  Gates, 376 F.3d at 341.

Plaintiff testified that, beginning in the Fall of 2010, the conditions became both unsanitary and unsafe due to "busted pipes leaking urine and sewer water under the bunks more than once and left for 5 to 6 days before fixed."  On one occasion, 54 inmates had only one urinal to use for ten days, and another time, only one urinal for six days.  The odor from the bathroom and clogged facilities permeated the dorms.

Plaintiff has adequately stated a constitutional violation, and the fact that he might not have contracted the ringworm or another infection from the conditions complained of is not fatal to his claim.

### 2.    Objective reasonableness.

If the Court finds a constitutional violation based on the summary judgment evidence submitted, it must then determine whether the violated constitutional right was clearly established within the context of the particular case.  Saucier, 533 U.S. at 201.

In this case, defendants do not dispute that the rights they allegedly violated were clearly established.  Indeed, the Fifth Circuit has recognized that an unsanitary environment can support an Eighth Amendment claim of deliberate indifference, noting:

> As a safeguard against the "gratuitous infliction of suffering," the eighth amendment forbids confinement under conditions that can lead to painful and tortuous disease with no penological purpose.  We concluded over a decade ago that the eighth amendment forbids deprivation of the basic elements of hygiene.  We observed this "common thread" woven through judicial condemnations of prison conditions, noting in most of the prior cases the deprivation of facilities for elementary sanitation.

Daigre v. Maggio, 719 F.2d 1310, 1312 (5th Cir. 1983).

See also Sanford v. Brookshire, 879 F. Supp. 691, 693 (W.D. Tex. 1994) ("Prison authorities may not withhold from prisoners the basis necessities of life, which includes reasonably adequate sanitation").

Here, plaintiff has presented uncontroverted evidence that defendants Morin, Ruiz, Delgado, and Cano personally reported to the Delta Dorm bathroom in response to the

complaints of unsanitary conditions, such that they observed the conditions first-hand. Indeed, in her January 18, 2010 memorandum, Officer Delgado confirms the very problems complained of by plaintiff and other inmates, and notes that seven (7) work orders have been generated. (DSJ Ex. A at 11).  Officer Delgado denies that there is fungus in the showers but instead characterizes the substance as soap scum; however, she does not dispute plaintiff's allegations of standing sewer water and odor, nor does she dispute that repairs are necessary. Curiously, there is no follow-up memorandum indicating that the repairs have been made, and when plaintiff then files a Step 2 appeal of his grievance, a second investigation is conducted.  (DSJ Ex. A at 6).  Again, however, there is no indication that the work is ever **done.**  On March 4, 2011, Grievance Investigator Robinson notes that the unit "**has** work orders" for the deficiencies.  Id.  He also explains that there is a "current state budget crisis" and that repair work is on an emergency basis only.  Id.  That is, there is no evidence to demonstrate that the unsanitary conditions complained of beginning in October 2010, had yet been repaired by March 2011.

No defendant has offered an affidavit or testimony suggesting that they were unaware of the unsanitary conditions.  Lieutenant Morin and Lieutenant Ruiz were both aware of the conditions because they came to the Delta Dorm and inmates complained to them directly. Warden Davis was made aware of the conditions by plaintiff and other inmates, but she failed to respond to their grievances.  Officer Cano was aware of the unsanitary conditions as she was the officer directly in-charge of maintaining the facilities, and Officer Delgado, as safety officer was made aware of the conditions, but she failed to correct the matter and

23

denied plaintiff and other inmates cleaning supplies.  Plaintiff's evidence establishes that there is a genuine fact issue as to whether defendants acted reasonably in the context of this case.  Therefore, summary judgment is not appropriate.

## V.      Recommendation.

For the reasons stated herein, it is respectfully recommended that the Court dismiss all claims against the defendants in their official capacities for money damages because such claims are barred by the Eleventh Amendment.   Otherwise it is recommended that defendants' and plaintiff's motions for summary judgment (D.E. 48, 43) be denied, and that all claims against all defendants in their individual capacities proceed to trial on the merits.

Respectfully submitted this 5th day of April 2012.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).